8   569|
28   431|

---

## T. G. T. KENDALL *v.* THE STATE.

1. HOMICIDE IN SELF-DEFENCE OR DEFENCE OF ANOTHER. — In regulating the right to take life in the necessary defence of person or property, the Code of this State establishes an essential distinction, based upon the nature and severity of the unlawful attack, and discriminates it into two classes. The first class comprises all cases in which, from the acts of the assailant or his words coupled therewith, it is reasonably apparent that his purpose or intent is to murder, ravish, rob, maim, disfigure, or castrate the assaulted party; and in such a case the latter, or any other person in his or her behalf, may lawfully slay the aggressor while he is committing the offence, or when he has done some act evidently showing his intent to commit it.

2. SAME — PRESUMPTION OF LAW FROM MEANS USED. — When the homicide was done to prevent murder, maiming, disfiguring, or castration, and the weapons or means used by the aggressor were calculated to effect his purpose, the Code makes it an absolute presumption of law that his design was to inflict the injury indicated. This legal presumption is imperative to juries as well as to courts, and, when applicable, must be given in charge to the jury.

3. SAME. — When a purpose or intent to murder, maim, or seriously injure is reasonably indicated by the attack, the law, in view of the exigency of the assaulted party, authorizes him, or any one who interposes in his behalf, to take the assailant's life without first resorting to other means to avert the danger.

4. SAME — WHEN AGGRESSION IS LESS SERIOUS. — Different principles obtain in the second class, to wit, when the purpose or intent reasonably indicated by the unlawful and violent attack is other than those heretofore mentioned. In such cases the Code requires that, before killing the aggressor, the injured party, or the person interfering for him, must resort to all

other means of prevention, though not bound to retreat; and if the attack is on the property of another, he who interferes in his behalf is not justifiable in killing the aggressor unless the life or person of the injured party is in peril by reason of the attack upon his property. The phrase "all other means" does not import all possible means, but all means reasonably proper and effective under the circumstances.

5. CHARGE OF THE COURT IN SUCH CASES. — When the facts in evidence place the case on trial clearly within either of the two classes thus discriminated by the nature of the attack, the duty of the court in its corresponding instructions to the jury is easily discharged by giving the law applicable to the proper class, and pretermitting that applicable to the other, because liable to confuse or mislead the jury. But when the evidence raises a question as to which of the two classes involves the case on trial, and therefore necessitates instructions upon both, the legal distinctions between them should be so elucidated that the jury cannot misapply to the one class the law applicable to the other.

6. SAME. — When, as in the present case, the facts demonstrate that the purpose of the deceased, when killed by the appellant, was to murder or maim another by the use of a deadly weapon, it was error for the court below to ignore in its charge the provision of the Penal Code which expressly enacts that in such a state of case the law presumes that the design of the deceased was to murder or maim. This presumption was conclusive of the design of the deceased, in case the jury found the facts to be as predicated.

APPEAL from the District Court of San Saba. Tried below before the Hon. W. A. BLACKBURN.

The indictment charges the appellant with the murder of William A. Brown, on May 21, 1878, by shooting him with a pistol. The verdict found the appellant guilty of murder in the second degree, and assessed his punishment at a term of five years in the penitentiary.

The court-house of San Saba County was the scene of the tragic occurrence related in this record. The court-room, it appears, was in the second story of the house, with the entrance through a vestibule on the south side, and in the north-east angle of the house, on the same floor, was a room known as the "county attorney's room," in the west wall of which was a door communicating with the court-room. At the time of the homicide this apartment was occupied as their law-office by S. S. Brooks, the county

attorney, and by Kendall, the appellant: William A. Brown, the deceased, was a saloon-keeper in the town of San Saba. So far as the record discloses, no animosity between him and the appellant had been manifested previous to the occasion of the homicide; but it appears that two serious altercations between Brown and Brooks had occurred recently before that event. The difficulty in which Brown met his death at the hands of the appellant began between Brown and Brooks, at the door leading into the court-room from the county attorney's office. At the trial in the court below, no living witness testified as to what passed between them before the appearance of the appellant; but Brooks, who survived the homicide of Brown but a few months, was a witness at the hearing of the case on *habeas corpus* for bail, and his testimony was then reduced to writing. This written testimony was introduced by the defence at the trial in the court below.

According to this posthumous testimony of Brooks, he was standing in the doorway between his office and the court-room, when Brown, the deceased, walked up and said, " Brooks, I am the G——d d——d——t fastest boy in Texas, you bet your monkey mutton. Brooks, you and old Thomas have acted the d——n ——." Brooks asked him why, and he replied, " You know d——n well that old Thomas has ruled more times in your favor than he has in ours." Brooks replied, " No; I was not pleased with his rulings myself; sometimes he ruled right and sometimes wrong." Brooks then walked from the door into his office, leaving Brown standing in the door. When Brooks got a few feet from the door, Brown, who had on no coat, jerked a pistol out from under his vest and cocked it, saying, " Come back here, you d——n son of a bitch, I am going to kill you." Brooks stepped back, asked Brown not to shoot him, and told Brown that he (Brooks) was not armed. Brown told Brooks that he (Brooks) was armed, and that he (Brown) was going to shoot him. Brooks begged him not to do so,

repeating that he was not armed.   About this time Kendall, the defendant, came in and remonstrated with Brown, asking him to let Brooks alone and go out.   Brown stepped back a little, and said to Kendall, "You go out of here," waved his pistol at him, and motioned him to go out at the door. Kendall walked out, and just at the door of the court-room leading to the stairs he met Triplett, the principal witness for the State, whose testimony, greatly condensed, will be found in the opinion.

Triplett, according to Brooks's statement, came to where Brown and Brooks were confronting each other in the door of the county attorney's office.   Putting his hand on the shoulder or arm of Brown, who was then holding his pistol down by his right leg, Triplett said something to him about going away; to which Brown replied, "I am not going." Brooks, throwing back his coat, told Brown he had said he could whip him (Brooks), and that if he would lay off that pistol, he (Brooks) would fight him a fist-fight and show him whether he could whip him.   Brown replied with vituperation too vile to print, and said he could whip Brooks, but was going to shoot him.   Brooks returned the vilification, and Brown jabbed his pistol at his face, but did not strike him with it.   Brooks started to a corner of the room where a double-barrelled gun was standing.   Triplett said, "Hold on, boys," or something like that; and Brown brought his pistol round over his head, and while it was still elevated it fired, sending the ball up in the corner of the court-room, as Brooks thought.   Brooks took up the gun, and, while still standing in the corner, there were other shots fired in the court-room.   After a brief interval, Brooks went to the door of his office and saw Brown lying on the floor just outside of the door, and still holding his pistol.   Brown looked towards Brooks and said "G—d d—n them," and Brooks closed his office door and remained inside until others came.   Within a few minutes he saw Kendall's pistol, and found two barrels of it empty and the

others loaded.   Two shots had struck in the facings of the door leading into the office, two others near a window in the north-east corner of the court-room, and a fifth had left its mark in the stairway hall, grazing the banister.   One of the shots which struck the facing of the door ranged upwards, as though fired from the floor at a distance of about eight feet.

On his cross-examination, Brooks stated that there was nothing to prevent Brown from shooting him before the arrival of Triplett, and that Kendall got his pistol after the adjournment of the court, a few minutes before the affray.

The testimony of Dan. H. Triplett, for the State, presented some circumstantial contradiction of Brooks's statement.   He said that when he went to the door of the office, Brown's pistol was not cocked, and that while he had hold of Brown the latter fired no shot.   Previous to his exit from the court-room, the only shots fired were the two by Kendall.   He also imputed to Brooks the first vituperative epithets exchanged between him and Brown, when the former proposed a fist-fight.   As a very clear summary of Triplett's testimony is given in the opinion of the court, there is no occasion to repeat it here.

G. W. Loftin, a witness for the State, was the first person who reached the deceased after he received the fatal wound.   Witness, who was then a deputy-sheriff, was on the ground-floor of the court-house, when, hearing the firing overhead, he immediately ran up the stairs.   About half-way up, he observed Kendall standing at the top, with a pistol in his hand.   Kendall said something about not letting any one come up.   Witness replied that he must come up, and went on into the court-room without resistance by Kendall.   There he saw Brown, the deceased, leaning on a railing in an awkward position.   The door of the county attorney's office was nearly, or quite closed.   Witness went back by Kendall, and nearly to the foot of the stairs, where there had gathered quite a crowd.   He told them not to

come upstairs, and then ran back in the court-room and
there found Brown prostrate, and when endeavoring to raise
him up, heard the door of the county attorney's office make
a noise as if opening.   The testimony of this witness details
many other circumstances, but nothing which seems mate-
rial, except that one of the shots which struck the door-
facings of the county attorney's office, and one of those which
struck near the north-east window of the court-room, came
from Brown's pistol while the witness was attempting to do
something to relieve the wounded man.   The witness
promptly put both Brooks and Kendall in arrest, and locked
them up in the county attorney's room, Kendall surren-
dering his pistol without difficulty.

On his cross-examination, the witness stated that Kendall,
at the head of the stairs, made no alarming demonstration,
but told witness not to let that crowd, or mob, come up
there ; and also remarked to witness, as he passed him, that
Brown was shot, and asked witness to come on and see
Brown.

There was much other testimony at the trial, but such of it
as related to the circumstances of the killing seems to reflect
no new light upon the case.   The affray occurred late in
the afternoon of May 21, 1878, and Brown died during the
ensuing night.   He had received but one ball, which entered
about two inches on the right of the backbone and came out
below the left nipple.

*James H. Burts*, *N. G. Shelley*, and *A. W. Terrell*, for
the appellant.

*Thomas Ball*, Assistant Attorney-General, for the State.

CLARK, J.   In prescribing the rules essential to be ob-
served in the exercise of the right of self-defence by a
person attacked, or by some other person in his behalf, our
Penal Code provides as follows : —

"Art. 569. Homicide is permitted in the necessary de-

fence of person or property, under the circumstances and subject to the rules herein set forth.

"Art. 570. Homicide is permitted by law when inflicted for the purpose of preventing the offence of murder, rape, robbery, maiming, disfiguring, castration, arson, burglary, theft at night,   *   *   *   whether the homicide be committed by the party about to be injured, or by some person in his behalf, when the killing takes place under the following circumstances : —

" 1. It must reasonably appear by the acts, or by words coupled with the acts, of the person killed, that it was the purpose and intent of such person to commit one of the offences above named.

" 2. The killing must take place while the person killed was in the act of committing the offence, or after some act done by him showing evidently an intent to commit such offence.

" 3. It must take place before the offence committed by the party killed is actually completed.   *   *   *

"4. Where the killing takes place to prevent the murder of some other person, it shall not be deemed that the murder is complete so long as the offender is still inflicting violence, though the mortal wound may have been given.

*       *       *       *       *       *       *

" 6. In cases of maiming, disfiguring, or castration, the homicide may take place at any time while the offender is mistreating with violence the person injured, though he may have completed the offence.

*       *       *       *       *   .   *       *

"Art. 571. When the homicide takes place to prevent murder, maiming, disfiguring, or castration, if the weapons or means used by the party attempting or committing such murder, maiming, disfiguring, or castration are such as would have been calculated to produce that result, it is to be presumed that the person so using them designed to inflict the injury.

"Art. 572. Homicide is justifiable also in the protection of the person or property against any other unlawful and violent attack besides those mentioned in the preceding article, and in such cases all other means must be resorted to for the prevention of the injury, and the killing must take place while the person killed is in the very act of making such unlawful and violent attack, and any person interfering in such case, in behalf of the party about to be injured, is not justifiable in killing the aggressor, unless the life or person of the injured party is in peril by reason of such attack upon his property.

"Art. 573. The party whose person or property is so unlawfully attacked is not bound to retreat in order to avoid the necessity of killing his assailant.

"Art. 574. The attack upon the person of an individual, in order to justify homicide, must be such as produces a reasonable expectation or fear of death, or some serious bodily injury."

These statutory principles, in connection with other provisions in the Code of Criminal Procedure relating to self-protection, or the protection of another from unlawful acts or violence (arts. 80, 86), and which provisions need not be specifically set out in this opinion, furnish the law of self-defence, or defence of another, in this State; and by these principles, as explained by the adjudged cases, the validity of this conviction must be tested.

The law separates unlawful violence to the person or unlawful attacks upon the person into two distinct classes, and the right of resistance, to the extent of taking life, must be exercised under essentially different conditions according to the nature and severity of the attack. If it reasonably appears by the acts of the assailant, or by his words coupled with his acts, that it is his purpose or intent to murder, ravish, rob, maim, disfigure, or castrate the assaulted party, then the latter, or some other person in his or her behalf, may slay the aggressor while he is in the act of com-

mitting the offence, or after some act is done by him show-
ing evidently an intent to commit such offence. If the
weapons or means used by the party attempting or commit-
ting the offence are such as would be calculated to produce
that result, it is an imperative presumption of law, not of
fact, that the person so using them designed to inflict the
injury (Penal Code, art. 571) ; the language of the statute
is that " it is to be presumed that the person so using them
designed to inflict the injury." Not that the jury may
presume that fact, or are authorized to exercise their intelli-
gent discretion in determining whether the person slain, in
view of all the evidence before them, really intended to per-
petrate the injury ; but if the weapon and the manner of
its use are such as would have been calculated to produce
the result, and the jury determine this affirmatively as a
question of fact, pertaining rightfully to their province, then
the law steps forward with its presumption and closes the
door to further inquiry. Its fiat is inexorable, and binding
upon juries as well as courts, that under such a state of
facts there shall be but one presumption, and that is that the
person slain designed to inflict the injury. This presump-
tion is often of material importance to the rights of a pris-
oner on trial for homicide, and who rests his defence upon
the ground that the homicide was justifiable, in the necessary
defence of his own person or the person of another ; and in
a proper case the jury must be informed of the principle,
as a part of the law applicable to the case.

Another feature pertaining to the classification under im-
mediate discussion is, that when a person is attacked under
such circumstances as reasonably indicate a purpose and
intent on the part of the attacking party to murder or maim
him, or to do him serious injury, the person so attacked is
not called upon to retreat ; nor is he, or any person who
interferes for him, compelled to resort to any other means
for the prevention of the injury, but may slay upon the spot,
being responsible for any mistake if the right of resistance

or interference is exercised under circumstances not sanctioned by law. The law presumes in such a case that the safety of the assaulted or threatened party depends upon prompt action in killing the assailant, and does not demand that all other means must be resorted to in order to avoid the threatened injury, because the contingency is a desperate one, and will not admit of temporizing or delay. It authorizes instant and efficacious action on the part of the assailed or of any other person, to the extent of depriving the assailant of his life, in order that the offence of murder or maiming may be prevented and one citizen be protected from the malice of another.

A rule quite different obtains if the attack does not reasonably indicate a purpose to murder or maim the injured party. If the attack is an ordinary assault and battery, or with a weapon not likely to produce death, or is used in a manner not calculated to produce that result, or the attack is upon property, and not endangering the life or limb of its possessor, — in these and like cases it is required of the person assailed, or the possessor of the property, or the person who may interfere for the protection of either, that all other means to avoid the threatened injury must first be resorted to, except retreat, before a right to slay enures; and the right does not obtain at all in behalf of the person who interferes for the protection of property, unless the life or person of the injured party is in peril by reason of such attack upon his property. This feature of the law, unlike the former classification, presupposes there may be time and opportunity to resort to other means for the prevention of the threatened injury. By it is not meant that all other possible means to avert the injury must be first resorted to, but only that all other means reasonably proper and effective should be first invoked before resorting to a right which, under the most favorable aspect of any case, must be deemed lamentable in its exercise. These distinctions are not new in our State. *Horbach* v. *The State*, 43 Texas,

424; *Blake* v. *The State*, 3 Texas Ct. App. 588; *Ainsworth* v. *The State*, *ante*, p. 532.

In the practical administration of justice in this class of cases, it is essential that these different principles, as appertaining to different features of the law of justifiable homicide, be not only kept in view by the courts, but care must always be exercised in preventing the jury from confounding principles applicable to justifiable homicide in defence of the person in cases of serious attack, with other principles which are applicable only in attacks of a milder character, or the reverse. The law makes different provisions for the exercise of the right of self-defence or the protection of another, according to the gravity, actual or apparent, of the attack; and the character of the attack must usually be determined by the judge in the first instance, before he delivers his charge to the jury. If the attack of the person slain was manifestly with intent to murder or maim, — that is, made with weapons or other means calculated to produce either of those results, — then there is no occasion to instruct a jury as to the law which obtains in case the attack was of a milder character, because such law is not applicable to the case, and can subserve no purpose other than to confuse the jury. On the other hand, if the attack clearly comes within the meaning of " any other unlawful and violent attack " than with intent to murder, or maim, or seriously injure, then the law governing the graver attacks should be altogether discarded as inapplicable. It can seldom happen in any case that such a determination by the judge can be attended with serious embarrassment, because it is only required to contemplate the weapons or means used by the assailant in the first instance, and if they are such as would have been calculated to produce death, or mayhem, then the law fixes the character of the assault. Penal Code, art. 571. But if, upon the trial of any case, the peculiar state of the evidence renders it necessary, in the opinion of the judge, to submit to the jury the law governing the right of

resistance to either character of attack, then great caution must be exercised in framing instructions, and the jury must be impressed with the distinctions which obtain in each case, in order that they may not apply to the one the law applicable to the other.

These principles are of easy application to the case under consideration. Regarding the evidence as to the actual homicide in its most unfavorable light for the appellant, it appears that his friend Brooks, who was his office-mate, and was then acting as the State's prosecuting officer in the county of San Saba, had had one or more difficulties with the deceased, which presumably arose from the discharge of some official duties by Brooks in some way distasteful to the deceased. These difficulties, which occurred during the absence of appellant, seem to have engendered bad blood and threatening acts on the part of deceased and others towards Brooks, inducing the latter to arm himself with appellant's gun, and to keep the same near at hand ready for immediate use.

On the day of the homicide, a prosecution against some person for a violation of the "local-option law" was being conducted in the court-house, Brooks and appellant being counsel for the State, which trial was of considerable public interest, it being contended on the part of those opposed to the enforcement of the law that it had not been legally adopted. The deceased, who kept a saloon, came within the latter category, was present during the trial and evidently warmly interested in the result. While the jury were out deliberating, bottles of lager-beer were conveyed into the court-room, apparently through the instrumentality or direction of the deceased, and the crowd was asked to drink. Being expostulated with by friends, including appellant, he desisted from his course, left the court-room with friends for the purpose of drinking, and subsequently returned. He was asked by the deputy-sheriff and another to leave the court-room, but refused. He returned into the

court-room, where Brooks, the county attorney, was alone, and in a corner of which was his office, and a quarrel ensued. It is immaterial, in so far as appellant is concerned, how that quarrel began and who was the aggressor, though the evidence does not leave us in much doubt upon the subject. Pending the quarrel, immediately within the door of the county attorney's office, the appellant came into the court-room, and found Brown, the deceased, standing at the door of Brooks's and appellant's office with a six-shooter in his hand, engaged in a fierce altercation with Brooks. He attempted to interfere and stay the quarrel, but was waived away by the deceased with his pistol. He then started to leave the court-room, and when outside the door met the chief witness for the State (Triplett), and implored him to go and stop the difficulty, telling him that Brown, the deceased, was "in there with his six-shooter out on Brooks." Triplett rushed in and seized Brown, whereupon Brooks, with an abusive epithet, offered to fight Brown a fist-fight, or a fair fight, the witness does not exactly remember which. Brown returned about the same epithet, wrung his hand out of Triplett's, and struck at Brooks with the pistol, more in the nature of a punch than a downright blow. The force of this movement seems to have thrown both Triplett and Brown into the county attorney's office, with the left hand of the former on the shoulder of the latter, and then Triplett again seized Brown's pistol-arm with his right hand, and pulled him out of the room. Brooks sprang for his gun in the south-west corner of the room, and the witness thinks he heard the click of the gun-lock. Brown said, "Dan, turn me loose ; he's got his gun." Triplett released his hold, and saying, "Boys, for God's sake don't shoot ; but if you will, do let me get out of the way," started for the outer door. Brown immediately returned to the south facing of the county attorney's office, cocked his pistol, aimed it obliquely into the room, and seemed to be peeping around. Just at this juncture the appellant ap-

peared in the court-room and fired two shots at Brown, one of which took fatal effect. The appellant then went out of the court-room to the head of the stairs, and subsequently delivered himself and pistol to the authorities, only two barrels of the latter being empty. After his retirement from the court-room, several shots were fired inside by some one, but Brooks's gun was found undischarged, and no other person but Brooks and Brown were in the court-room.

. Without intimating any opinion as to the weight of this particular portion of the evidence detailed, or any other portion, it may be said that if Brown was making any attack whatsoever upon Brooks at the time he was shot, which was a legitimate subject of inquiry and determination by the jury, then no question can arise as to the nature of that attack. Taking into consideration the weapon used, the manner of its use, and the circumstances immediately attendant upon the transaction, the mind can reach but one conclusion after it once determines that such attack was made, and that is, that it was such an attack as reasonably demonstrated a purpose and intent on the part of Brown to murder or maim Brooks. No fact or circumstance appears which could justify a conclusion, after it is once determined that an attack was made or about to be made, that such attack was of a milder character and made with a purpose to inflict a less degree of injury than to murder or maim.

. Under these circumstances, an instruction as to the law governing the exercise of the right of self-defence against an unlawful and violent attack other than with purpose to murder or. maim was not appropriate or called for by the evidence ; and the tendency of such an instruction could only be hurtful to the prisoner upon trial, by clouding the true and substantial issue, and thus confusing the jury in their application of the law given them in charge to the facts found to be true. The court, in its charge, should have entirely ignored the provisions of art. 572 of the Penal Code,

and should have confined its instruction upon this phase of the evidence to the provisions of art. 570.

It may often happen that instructions not pertinent to the issues involved may be interwoven with the law applicable to the case without constituting material error, it being patent upon appeal that the inapplicable principles given to the jury could not have misguided them in reaching their conclusion. In such a case the error is deemed harmless. But it may sometimes occur that the shades of distinction between the principles of law applicable and inapplicable are of so delicate a character, and leading in such different directions, that without the exercise of extraordinary caution by the court, in framing its charge, the jury are much more liable to mistake the principles really applicable to the case than to make a proper selection. In such a case it cannot be said that the court has " distinctly set forth the law applicable to the case," or that the redundancy of the charge has proven harmless. The distinction between the character of the two classes of attack upon the person which justify resistance and interference, under our law, has hitherto not been clearly grasped by the profession, who have made the law their life study ; and when these principles are laid before an average jury, side by side upon a page or two of a written charge, and couched in the general language of the statute, it is not difficult to imagine a confusion in their minds calculated to lead in most instances to an inevitable mistake.

But a more serious defect in the charge lies in the fact that, although it is otherwise able, accurate, and comprehensive, except as hereinbefore pointed out, it wholly ignores the provisions of art. 571 of the Penal Code, and altogether fails to instruct the jury as to the legal presumption which obtains in cases of this character, when certain facts are established to the satisfaction of the jury. The provisions of this article were directly applicable to certain phases of the evidence, and of paramount importance to the rights of the

defendant.  If the jury believed from the evidence that, at the time the fatal shot was fired by the defendant, the deceased, Brown, was making a violent attack upon Brooks, under circumstances which reasonably indicated an intention upon ·his part to murder or to maim Brooks, and the weapon used by Brown, and the manner of its use, were such as were calculated to produce either of those results, then the law presumed that Brown designed to murder or to maim Brooks, and the jury should have been so informed in the most explicit terms.  This was not done; but, on the contrary, the jury, by the charge of the court, were required to base any theory of justification, not upon the legal presumption arising upon the weapon or means used by Brown, but solely upon the fact that " it must have reasonably appeared to the defendant, by some acts, or words coupled with the acts, of the said Brown, that it was his (Brown's) purpose and intention to commit the offence of murder on the person of said Brooks, or do him serious bodily injury." The defendant was not required to stand alone upon the fact as to how the attack reasonably appeared to him; but if in fact it appeared to the satisfaction of the jury, upon the trial, that in making the attack Brown used weapons or means such as would have been calculated to produce murder or maiming, the jury were commanded by the law to presume that Brown did in fact design to inflict one of those injuries.  The importance of this additional principle in reaching a conclusion, by the jury, needs no demonstration.

For error in the charge of the court as herein indicated, the judgment is reversed and the cause remanded.

*Reversed and remanded.*